Columbia, May, 1876.

HEARD MAY TERM, 1876.

STATE, *ex rel.* McKINLAY, *vs.* CARDOZO, STATE TREASURER.

Under an Act of the Legislature, bonds of the State were issued to raise money to be used in the purchase of lands to be sold to settlers thereon, and the interest on the purchase money of the lands, when sold, to be applied by the State Treasurer to the payment of the interest on the bonds issued under the Act: *Held,* That the Act constituted part of the contrac twith the holders of the bonds and that the State had no right to divert the fund arising from the interest on the purchase money of the land from the payment of the interest on such bonds.

When the State borrows money on bonds issued by it for that purpose and pledges a certain fund for the payment of the interest to accrue thereon, such pledge is a part of the contract with the holders of the bonds, and the State has no right, under Article I, § 10, of the Constitution of the United States, to impair the obligation of the contract by diverting the fund to other purposes.

This was an application to the Supreme Court by William J. McKinlay against F. L. Cardozo, State Treasurer, for a writ of *mandamus.*

The petition alleged :

1. That Francis L. Cardozo is the Treasurer of the State of South Carolina.

2. That by an Act of the Legislature of the State of South Carolina entitled "An Act to provide for the appointment of a Land Commissioner and to define his duties and powers," approved March 27, 1869, it. is provided:

"SEC. 4. That it shall be the duty of the said Land Commissioner to purchase or cause to be purchased any lands in any portion of the State, improved or unimproved, at such prices as the said Advisory Board may determine, not to exceed in the aggregate amount in any one fiscal year the par value of the public stock of this State created by the General Assembly for this purpose.

"SEC. 5. The Treasurer of the State is hereby authorized and directed to issue to the Land Commissioner bonds of the State in the sum of two hundred thousand dollars, with coupons attached, if, in the opinion of the said Advisory Board, so much be necessary, bearing six per cent. interest, the principal payable in twenty years at the financial agency of the State in the city of New York; the bonds to be signed by the Governor, countersigned by the Comptroller General, and the coupons to be signed by the Treasurer of the State.

"The faith and credit of the State is hereby pledged to the payment of the principal and interest of such bonds ; and a sufficient amount of taxes is hereby levied to pay the interest accruing on said bonds annually.

"Sec. 6. All lands purchased by said Land Commissioner shall be subdivided into sections containing not less than 25 nor more than 100 acres, to be sold to actual settlers, subject to the condition that one-half thereof shall be placed under cultivation within five years from the date of such purchase, and that the purchaser shall annually pay interest at the rate of six per cent. per annum upon any moneys remaining unpaid, and also all taxes imposed thereon by the authority of the United States or of this State; and in addition thereto shall, in every year after the third from the date of said purchase, pay one-fifth of the principal. The title to said land shall remain in the State until the amount of said purchase shall be paid, principal and interest; but a certificate of such purchase shall be assignable at three years from the date thereof: *Provided,* That in every case where a person purchases more than one section of 50 acres, they shall pay on such excess one-fourth cash, and the balance to be paid in equal annual installments of one-fourth the amount of purchase each year: *Provided,* That no person shall be entitled to purchase in his own name or for his own use more than 100 acres.

"Sec. 7. It shall be the duty of the said Land Commissioner to deposit with the Treasurer of the State all moneys collected by him as interest due upon the sale of said lands, which shall be used by the Treasurer of the State in the payment of the interest on the stocks and bonds of the State issued for the purchase of said lands, and to invest in bonds of this State all moneys received by the Land Commissioner in payment for said lands as principal; said State bonds to be deposited with the Treasurer of the State to constitute a sinking fund for the final payment and redemption of all stocks or bonds issued by the State for the purchase of said lands. The interest accruing on the bonds of the said sinking fund shall be applied to the payment of the interest upon the stocks or bonds of the State issued for the purchase of lands."

3. That by the further Act of the Legislature of the State of South Carolina entitled "An Act to amend an Act entitled 'An Act to provide for the appointment of a Land Commissioner and

to define his powers and duties, and for other purposes therein mentioned,'" approved March 1, 1870, it is provided;

"SECTION 1. *Be it enacted* by the Senate and House of Representatives of the State of South Carolina, now met and sitting in General Assembly, and by the authority of the same, The Treasurer of the State is hereby authorized and directed to issue to the Land Commissioner bonds of the State in the sum of $500,000, with coupons attached, if, in the opinion of the Advisory Board, so much be necessary, bearing six per cent. interest, the principal payable within twenty years at the financial agency of this State in the city of New York, the bonds to be signed by the Governor and countersigned by the Treasurer of the State, and the coupons to be signed by the Treasurer of the. State, which bonds shall be negotiated in such form and manner as the Advisory Board, by a majority of votes, shall determine.

"The faith and credit of the State is hereby pledged to the payment of the principal and interest of said bonds; and a sufficient amount of taxes is. hereby levied to pay the interest accruing on said bonds annually."

4. That by virtue of the said Acts the Treasurer of the State of South Carolina issued to the Land Commissioner bonds of the State in the sum of ——— hundred thousand dollars, with coupons attached, which said bonds with coupons attached were, according to the provisions of said Acts and for the purposes therein mentioned, duly negotiated and sold.

5. That your petitioner is now the legal owner and holder of ten (10) coupons, each for the sum of thirty dollars, which matured on the first day of April, 1872; ten (10) coupons, each for the sum of thirty dollars, which matured on the first day of October, 1872; ten (10) coupons, each for the sum of thirty dollars, which matured on the first day of April, 1873; ten (10) coupons, each for the sum of thirty dollars, which matured on the first day of October, 1873; ten (10) coupons, each for the sum of thirty dollars, which matured on the first day of April, 1874; all of which are coupons of bonds issued under the provisions of said Acts and now past due, amounting in the aggregate to the sum of $1,500, a schedule of which said coupons is attached and made a part of this petition.

6. That by the seventh Section of the Act of March 27, 1869, a fund was created for the payment of the interest on the said bonds, and it was further made the duty of the State Treasurer so to use the

said funds. And your relator further showeth that there is now in the hands of the said Francis L. Cardozo, State Treasurer, a large sum of money accruing from the sales of lands held by the State for the purposes of the Land Commission and also from the interest accruing on the State bonds purchased by the said Land Commis- sioner with the proceeds of sales of land, which said fund is only applicable to the payment of the interest on the bonds issued under said Acts and ample for the payment of the coupons held by your relator.

7. That your relator has presented the said coupons at the Trea- sury of the State to the said Francis L. Cardozo and demanded payment thereof, and that the said Francis L. Cardozo, though required by law to apply the said funds in payment of said coupons, has refused so to do.

8. And your relator further shows that he has been informed and believes that the said Francis L. Cardozo, as State Treasurer, is about to apply the said fund to the payment of other claims against the State of South Carolina, and thus divert the same from its legitimate purpose, to the great wrong and injury of your relator.

Wherefore, inasmuch as the said Francis L. Cardozo, State Trea- surer, refused and still refuses to pay the said coupons from the fund so applicable thereto, and as your relator has no other adequate remedy by law, your relator prays that the said Francis L. Cardozo, State Treasurer, may be required and commanded to pay to your relator the amount due on said coupons out of the fund in his hands arising under the provisions of said Acts; and that until the further hearing and final disposition of your relator's petition the said Francis L. Cardozo, State Treasurer, be enjoined and restrained from making any disposition whatsoever of the fund aforesaid; and for such other and further reliefs as may be proper.

A rule to shew cause was issued and a return thereto made by the State Treasurer, setting forth the grounds upon which he refused to pay the coupons held by the petitioner.

These grounds sufficiently appear in the opinion of the Court.

*Clark,* for petitioner:

No one of the causes shown is sufficient to withhold from this petitioner the benefit of the writ prayed.

I. The first objection to the granting of the writ, "that the relator has no right and there is no corresponding duty on the part of the respondent which the Court will enforce by the writ of *mandamus*," is fully met by an examination of the statutes under which the bonds in question were issued.—Ordinance of Convention, March 7, 1868; 14 Stat., 34; 14 Stat., 275; 14 Stat., 385; Gen. Stat., Chap. 17, § 68, 126.

If, therefore, we have shown that in the relator there is a clear legal right to demand of the respondent payment of the coupons out of the fund set forth in the petition, and that the law affords no other adequate or specific remedy to secure the enforcement of the right and the performance of the duty which it is sought to coerce, then the relator has brought himself within the rule which warrants the issuing of the writ.—High's Ex. Leg. Rem., §§ 9, 10; Moses on Mandamus, 16; *Morton, Bliss & Co.* vs. *Comptroller General*, 4 S. C., 472.

The duty is one which the Court will enforce by its writ of *mandamus*. It is purely ministerial.

The authority by which the act is performed is the mandate of the superior, to wit, the Act of the Legislature.—14 Stat., 276, § 7; High's Ex. Leg. Rem.. §§ 24, 34, 80.

A duty is ministerial when an individual has such a legal interest in its performance that neglect of performance becomes a wrong to such individual.—*Morton, Bliss & Co.* vs. *Comptroller General*, 4 S. C., 474.

II. The defense of the fourth cause set forth in the return is met by the production into Court of the coupons described in the petition, which the relator now exhibits, and which, by consent of parties, shall be received as a sufficient proof of the fifth paragraph of the petition.

III. The defenses set forth in the second and third paragraphs of the return may properly be considered together; for if the operation of the Acts therein referred to be such as is contended for by the respondent, then are both of them repugnant to the Constitution of the State and of the United States, as laws "impairing the obligation of contracts," and null and void.—Constitution S. C., Art. I, § 21; Constitution U. S., Art. I, § 10.

Section 7 of the Act of March 27, 1869, is a part of the contract between the State and all holders of bonds (or coupons) issued in pursuance of said Act, and cannot be repealed, or the revenue

arising from said source be diverted by future legislation, without impairing the obligation of the contract.

"When the authority under which a contract for borrowing is made proceeds wholly from the Legislature, the Act and the proceedings of that body in reference to it enter into and become part of such contract."—*Morton, Bliss & Co.* vs. *Comptroller General,* 4 S. C., 449.

"Laws in existence when the contract is made are necessarily referred to and form part of the contract, and .fix the rights and obligations growing out of it."—Sedgwick on Stat. and Const. Law, 640, 651.

Obligation of contracts.—Cooley Const. Lim., 285, *et seq.* (cases cited); Sedgwick Stat. and Const. Law, 616, *et seq*; *Fletcher* vs. *Peck,* 6 Cranch, 87; *Bronson* vs. *Kinzie,* 1 How., 297; *McCracken* vs. *Haywood,* 2 How., 608; *Dartmouth College* vs. *Woodward,* 4 Wheat., 518; *Planters' Bank* vs. *Sharp,* 6 How., 327; *McGee* vs. *Mathis,* 4 Wall., 143; *Von Hoffman* vs. *City of Quincy,* 4 Wall., 535; *Wabash and Erie Canal* vs. *Beers,* 2 Black, 448; *Gunn* vs. *Barry,* 15 Wall., 610; *Cochran* vs. *Darcy,* 5 S. C., 125.

*Stone,* Attorney General, contra:

The question really involved in this case is, whether the provisions of the seventh Section of the Act of March 27, 1869, (Vol. 14, p. 275, Stat. of S. C.,) entered into and formed a material part of the contract made by the State with the holders of the coupons in controversy.

There is no question but that the provisions of Section 5 of said Act did form a part of the contract, and that the taxes levied by said Act can be collected by means of a *mandamus* issued to the proper State officers.

The decision in the case of *Morton, Bliss & Co.* vs. *Comptroller General* (4 S. C., 430,) settles this point.

But Section 7 of said Act is a present direction by the General Assembly to the Land Commissioner as to the disposition to be made by him of the moneys collected upon sales of land. He is told to pay this money into the State Treasury, and the State Treasurer—at the moment the Act is passed, and before any bonds are issued or lands sold, and before any money has come into his hands,—is directed to invest it in the mode therein prescribed.

There is nothing in the Act itself to indicate that the General Assembly intended by this merely administrative legislation to tie the hands of all subsequent Legislatures so that these funds might not be invested in some other way.

Thus, for instance, it would be clearly lawful for any General Assembly to order the investment of these funds in bonds of the United States instead of bonds of the State; or the State could lawfully extend the time within which purchasers might pay for lands; or it could even go further, and release the debt of the purchaser altogether. Now, while such legislation might lessen the ability of the State to pay its debts from this source of revenue, it could not be said to impair the obligation of the State's contract with the bondholder or impair the remedy given him to collect his debt.

The Act in question had some other purposes in view than merely to provide for the issuing of bonds and the giving of a remedy to the holders thereof to collect the interest and principal due them; and this seventh Section refers to some of the other purposes.

The real inducement held out to the purchasers of these bonds is the provision for their payment, found in Section 5, and not in the uncertain mode, provided by Section 7, of finally paying interest and principal out of the proceeds of sale of lands. .

But even if the provisions of Section 7 be regarded as a part of the contract, they belong to the *remedy,* and do not form a part of the *obligation* of the contract.

And the decisions of the Supreme Court of the United States admit that laws affecting the remedy are not unconstitutional so long as there remains some efficient remedy to enforce the contract.—*Sturges* vs. *Crowninshield,* 4 Wheat., 122; *Gunn* vs. *Barry,* 15 Wall., 610.

Unless, then, the bondholder could compel the State Treasurer to invest the funds accruing under said Act in the manner directed thereby, even though subsequent legislation should direct another disposition of it, he cannot compel the State Treasurer to pay to him the interest due him out of such moneys.

We do not think such a power is contended for or that it would be recognized by the Courts.

If it be true, as contended for by the respondent, that the provisions of said Section 7 are merely a direction to the State Treasurer made by one Legislature, which another and subsequent Legis-

lature could change, then it is clearly within the constitutional power of the General Assembly to make an appropriation of the moneys received by the State Treasurer from the Land Commission department to an object other and different from that at first contemplated. And the General Assembly having exercised such power, the Courts are powerless to review its action.

July 25, 1876.   The opinion of the Court was delivered by .

Moses, C. J.   It is admitted in the argument on the part of the respondent that the provisions of the fifth Section of the Act of 1869 (14 Statutes at Large, 385,) entered into and formed a material part of the contract made by the State with the holders of bonds issued under its direction and authority.   Neither the genuineness of the coupons set out in the suggestion nor the title of the relator is disputed, and the only question left for our determination involves his right to demand their payment out of the fund provided and set apart, as he claims, for that purpose by the seventh Section of the said enactment.

Its language is as follows : "It shall be the duty of the said Land Commissioner to deposit with the Treasurer of the State all moneys collected by him as interest due upon the sale of lands, which shall be used by the Treasurer of the State in the payment of the interest on the stocks and bonds of the State issued for the purchase of said lands, and to invest in bonds of the State all moneys received by the Land Commissioner in payment for said lands as principal; said State bonds to be deposited with the Treasurer of the State to constitute a sinking fund for the final payment and redemption of all stocks or bonds issued by the State for the purchase of said lands.  The interest accruing on the bonds of the said sinking fund shall be applied to the payment of the interest upon the stocks or bonds of the State issued for the purchase of lands."

The relator contends that the money in the hands of the Treasurer, collected as interest due upon the sales of said lands, is pledged for the payment of the interest on the stocks and bonds of the State issued for their purchase; that the provisions of said Section enter into and become part and parcel of the contract between the State and the holders of bonds and stocks, and any diversion by the State of such proceeds impairs the obligation of the contract, and is, therefore, void and of no effect, because repugnant to the

tenth Section of the first Article of the Constitution of the United States.

It is not denied that there is in the hands of the Treasurer, derived from the sources specified in the said seventh Section, a sum sufficient for the payment of the coupons held by the relator, and that it is only withheld because the General Assembly, by the Act approved March 3, 1876, to make appropriations to meet "the ordinary expenses of the State government for the fiscal year commencing November 1, 1875," (16 Stat. at Large, 97,) diverted it to other purposes.

The intent of the Act is too clear to admit of any doubt as to the purpose of the Legislature proposed, or the mode by which it was to be accomplished. The money for the purchase of the lands was to be raised on the bonds directed to be issued, and as to these certain terms and stipulations are expressed with no other possible view than to add to their worth and security. The greater the certainty of payment to the holder of the bond, the higher would be the market value. If the means of meeting the interest and of reducing the bonds were provided and assured in a fixed and permanent form, there would be a higher guaranty than that promised by the pledge of "the faith and credit of the State," which could not be practically enforced by the process of the legislative Acts in the conscience of those who chance, from time to time, to constitute the General Assembly.

As was said in *Morton, Bliss & Co.*, vs. *the Comptroller General*, (4 S. C., 448,) "when a sovereign State enters into a contract of borrowing with an individual, it assumes to be bound, in all particulars as an individual under like circumstances would be bound, by what is expressed or properly implied by the terms of such contract." If one agreed with another that, for the security of the punctual payment of the interest and principal of a loan, he would set apart, by delivery to a third person, certain securities, from the income of which, at fixed periods, it would be returned, would not his attempt to convert them from the use to which they had been appropriated by diverting them to another, entirely inconsistent with the one to which they had been before devoted, be good cause for the interposition of a preventive remedy through the Courts? As if to render certain the object proposed by the provisions of the said Section, "the Treasurer is required to invest in the bonds of the State all moneys received by the Land Commissioner in pay-

ment for said lands as principal, said State bonds to be deposited with the Treasurer of the State to constitute a sinking fund for the final payment and redemption of all stocks or bonds issued by the State for the purchase of said lands. The interest accruing on the bonds of the said sinking fund shall be applied to the payment of the interest upon the stocks or bonds of the State issued for the purchase of lands." A permanent mode of absorbing the whole loan is provided in the nature of a sinking fund, which promised as certain a security for the loan as the State could well supply in addition to that which it had at the same time furnished by the fifth Section.

In fact, the seventh Section afforded at least a more available security for the payment of the bonds issued under the Acts than did the fifth; for, while the Acts declared that "a sufficient amount of taxes is hereby levied to pay the interest accruing on said bonds annually," it made no provision for the redemption of the bonds, and even the tax to meet the interest could only be levied through the action of some future Legislature fixing the rate that would be necessary to ensure the "sufficient amount of taxes to pay the annual accruing interest." If, as is said at page 449, in *Morton, Bliss & Co.* vs. *Comptroller General,* already cited, " when the law-making power makes a contract with an individual the legislation conferring authority upon its agent and limiting his powers is to be considered a part of the contract, of which one dealing with the State is bound to take notice," surely the State must stand bound to the terms and conditions which it imposes on itself as a security for the investment which it invites. In the same case the principle now invoked by the relator was thus announced : "When the authority under which the contract of borrowing is made proceeds wholly from the Legislature, the act and proceedings of that body in reference to it enter into and become a part of that contract."

It is claimed by the respondent that it is within the power of any General Assembly to order the investment of these funds in bonds of the United States instead of bonds of the State, or go further and release the debt of the purchaser altogether. As to the first, it is enough to say, if such a change diminished the security of the bondholder the obligation of the contract would necessarily be violated. As to the last, the State has pledged the proceeds of all the lands sold as a security to the bondholder, and devoted them, on valuable consideration, to the constitution of a fund for the pay-

ment of a specific class of creditors. The security, though not in the form or language of a mortgage, attaches to it all the incidents and obligations of such an instrument, and the debtor can with no more propriety or right divert the funds from the purpose to which he has devoted it by his contract than could the mortgagor affect the priority and validity of his mortgage by converting the subject of it to some other and different use.

But it is said that "even if the provisions of Section 7 be regarded as a part of the contract they belong to the remedy and do not form a part of the obligation of the contract." Where an agreement is entered into by a State through an Act of its General Assembly, its terms are to be found in the provisions of the Act to which it owes its creation. Its intent can in no other way be ascertained; and whatever of the substance of the contract is therein expressed enters into the obligation, which is mutually binding. In no sense can the said Section be said to belong to the remedy. It sets forth the terms of the loan and provides a security for its payment; fixes a time for its redemption, and in and of itself constitutes one entire contract, imposing "the duty of performing it," which, following the eminent authorities cited, we have said in *State* vs. *The Bank of the State of South Carolina*, (1 S. C., 78,) " constitute the obligation." Even if the respondent is right in assuming that the provisions of the said Section belong only to the remedy, the diversion of the fund proposed by the Act of 1876 so affected the mode of payment which they designated as entirely to destroy it. On this point it is enough to repeat here what we said in the case to which we last referred, quoting the language of Mr. Justice Washington in Green & Biddle, (8 Wheat., 1,) adopted by Dunkin, C. J.; in *State* vs. *Carew*, (13 Rich., 498). If the Act so change the nature and extent of existing remedies as materially to impair the "rights and interests of the owner, they are just as much a violation of the compact as if they directly overturned his rights and interests."

Let the writ issue requiring the Treasurer to pay the coupons described in the petition out of the funds applicable thereto in conformity to the opinion of the Court. The order will be considered as extending only to the coupons the subject of the proceeding.

*Wright*, A. J., and *Willard*, A. J., concurred.